UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA        )
                                )
v.                              )    Criminal Action No. 05-10060-RCL
                                )
BENJAMIN ESPINOZA,              )
            Defendant           )
_____  )

ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

LINDSAY, DISTRICT JUDGE

The defendant Benjamin Espinoza ("Espinoza") is charged with conspiracy to transport, and transportation of, illegal aliens. Espinoza has moved to suppress certain statements he made to and other evidence discovered by Special Agent Glen Fitzpatrick ("Fitpatrick") of the United States Immigration and Customs Enforcement ("ICE") following a stop of a vehicle in which Espinoza was riding on the morning of February 7, 2004. For the reasons that follow, I GRANT the motion and order that the disputed evidence be suppressed.

Some time during the morning in question, Espinoza, a United States citizen, was in the passenger seat of a van that was parked with the engine running in Everett, Massachusetts. Fitzpatrick, in civilian clothes and carrying a holstered firearm, approached the driver's side window, flashed his badge, and identified himself as an ICE agent. Speaking in Spanish, he immediately requested identification from the driver, Ambrosio Villareal ("Villareal"), and then directed Villareal to shut off the engine.

The first matter to be resolved on the present motion is the point at which a seizure occurred. Thereafter, I must determine whether the seizure was justified under the Fourth

Amendment.

A seizure may occur without physical restraint. "If an officer, by means of show of authority, even briefly restrains the liberty of a citizen," a seizure has occurred. *United States v. Smith,* 423 F.3d 25, 28 (1st Cir. 2005). The essential feature of a seizure is coercion, as contrasted with voluntary compliance. *Id.* Thus no seizure occurs merely because an officer approaches a person to ask a question, unless it is objectively reasonable for the person to believe that he is required to stay and answer the question; that is, no seizure occurs unless the circumstances, viewed as a whole, show that the person's freedom of movement was objectively restrained. *Id.*

I find that, under the circumstances of this case, Fitzpatrick's display of his badge and his command that the engine be shut off was a seizure. Those events, occurring in rapid sequence, objectively restrained the occupants of the van, including the defendant.[1] At the point of the seizure, Fitzpatrick had only the following information.

At approximately 8:30 a.m. on February 7, 2005, Fitzpatrick merged into northbound

---

[1] Fitzpatrick testified that he directed Villareal to shut off the engine of the van, because the noise of the van made it difficult for to him to converse with the occupants of the vehicle. There is no evidence, however, that the occupants of the van were aware that the reason Fitzpatrick told Villareal to shut off the engine was to facilitate conversation. Furthermore, Fitzpatrick testified that it was his intention that the van not be moved until the occupants had identified themselves. While the officer's subjective intent is not dispositive of the seizure question, I may nevertheless infer, and do infer here, that it is likely that Fitzpatrick's intention was conveyed in the tone and manner with which he directed Villareal to shut off the engine. Indeed, Fitzpatrick testified that he communicated with the occupants of the van and otherwise conducted himself in such a way as to gain the cooperation of the occupants "whether or not [it was] what they really want[ed] to do.". *See United States v. Mendenhall*, 446 U.S. 544, 554 and n.6 (1980) (noting that the subjective intention of the officer is irrelevant "except insofar as that [intention] may have been conveyed to the respondent," and giving, as an example of a circumstance that might indicate a Fourth Amendment seizure, "the use of language or tone of voice indicating that compliance with the officer's request might be compelled.").

traffic on I-93 in Boston at the wheel of an unmarked Ford Expedition. He immediately noticed a white, extended passenger van - - "much like a commuter van" - - bearing Texas license plates traveling in the same direction. Fitzpatrick remembered that in August, 2004, fellow ICE agents in Massachusetts had intercepted two and perhaps three similar passenger vans that were transporting illegal aliens. When the van exited the I-93 tunnel, Fitzpatrick was able to see the silhouettes of several passengers through the van's tinted windows.

Fitzpatrick contacted sector communications and discovered that the van was registered to one Jesus Zendejas ("Zendejas") of Dallas, Texas. Fitzpatrick was aware that during a prior investigation, that name had appeared on telephone toll records: a phone subscribed to by Zendejas had received a call from a person suspected of human smuggling. [2]

---

[2] The government's papers stated that these toll records "revealed *a call* from the suspected smuggler to a telephone number for which Mr. Zendejas was the subscriber." (emphasis added). The investigation of the suspected smuggler led to the filing of no criminal charges, and Fitzpatrick had no specific information that Zendejas was involved in illegal activity. The government objected to further inquiry concerning the investigation of the suspected smuggler based on the law enforcement privilege.

In answer to a question on cross-examination at the evidentiary hearing, Fitzpatrick testified that the owner of one of the vans intercepted by ICE agents in August 2004 was Alfonso Garza, a former business partner of Zendejas. I find, however, that the connection between Garza and Zendejas was not something that Fitzpatrick had in mind when he effected the seizure that presently is at issue. For one thing, the papers filed by the government before the evidentiary hearing make no mention of this relationship. Furthermore, Fitzpatrick did not mention the Garza-Zendejas relationship or Garza's connection to the vans seized in August, 2004 in his direct examination. Had these been important considerations in the seizure now at issue, in my view, they would have been mentioned both in the papers supporting the motion and on direct examination.

In all events, the connection between Zendejas and the seizure in August 2004 is tenuous at best. All that Fitzpatrick could say on the subject was that at some point Zendejas and Garza were partners in the tourism business. Fitzpatrick could not say when that partnership ended, although I infer from the record as a whole that Fitzpatrick did not believe that partnership was in existence at the time the van was seized in August 2004. Moreover the person arrested with the van in August 2004 was not Garza, but the driver of the van. There is nothing in this record about a connection between Zendejas and the driver of the van seized in August 2004.

The van drove north on I-93 until it exited the highway and continued to the Revere Beach Parkway in Everett. Fitzpatrick followed the vehicle for approximately 25 minutes. During his surveillance of the van, Fitzpatrick observed no traffic violation. Indeed, he testified that he observed absolutely nothing unusual during his surveillance of the van. After the van pulled off the road and parked, facing a sandwich shop, Fitzpatrick parked 50 feet away and quickly approached the vehicle on foot. At the time he approached, Fitzpatrick knew that the Boston area was not a place commonly associated with the smuggling of undocumented aliens. When he asked Villareal and the defendant for identification, they did not appear nervous or elusive in any way, and they provided appropriate documentation.[3] Indeed none of the occupants in the vehicle were reluctant to provide identification. As discussed above, seconds after reaching the driver's window and showing his badge, Fitzpatrick made the seizure by displaying his badge and ordering that the van's engine be turned off.

The seizure here can only be justified if it is found to have been a *Terry* stop, a brief investigatory stop supported by reasonable suspicion that criminal activity may be occurring. *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *United States v. Monteiro*, 447 F.3d 39, 43 (1st Cir. 2006). The government bears the burden of showing that the purported *Terry* stop is constitutionally valid. *Monteiro*, 447 F.3d at 43. Specifically, the government must show that, under all the circumstances as they then appeared, the stop was grounded on a particularized basis for a reasonable suspicion that "legal wrongdoing" was afoot. *Id.* The detaining officer may draw on

---

[3] There was some difference in the date of birth stated on the driver's license presented by Villareal from that appearing on the alien registration card he presented. Fitzpatrick's recollection, at the evidentiary hearing, was that the difference was in the year stated for Villreal's birth. That raised in his mind, however, only the question of which of the two dates was valid.

his experience and specialized training in making the *Terry* seizure, "[b]ut the reasonable suspicion standard imposes meaningful limits on temporary detentions." *Id.* The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch'" to justify the stop. *United States v. Maguire,* 359 F.3d, 71, 76 (1st Cir. 2004) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also Monteiro,* 447 F.3d at 43.

There was nothing in the objective circumstances here to suggest to a reasonable officer in Fitzpatrick's position that criminal activity was afoot. The van was legally registered; there is no evidence that it had been reported stolen. It was being operated in conformity with traffic laws and was not otherwise unusual. The van was occupied by several passengers, but that did not remove it from the ordinary, because it was a vehicle designed to transport multiple passengers. Its only "peculiarity" was that it bore Texas plates, and, in that regard and its design, it was like two or three vans seized with illegal aliens as passengers several months earlier.

If the intrusion here is constitutional, then it would appear that all stops of passenger vans with Texas plates and multiple passengers in the Boston area would be constitutional. Surely the test for a constitutionally valid seizure requires more than this. *Cf. United States v. McKoy*, 428 F.3d 38, 41 (1st Cir. 2005) (noting that "[i]t is simply not reasonable to infer that a driver is armed and dangerous [and therefore may be pat-frisked] because the officers believe that he appears nervous and reaches toward the car's console when approached by police, even in a high-crime neighborhood"). As I view the evidence, the seizure in this case was based on nothing more than a hunch. To be sure, the Zendejas connection adds an additional element to the calculus, but the tendrils of information known to Fitzpatrick about this individual are insufficient to transform

the hunch into reasonable suspicion. Accordingly, I find that the seizure here did not meet constitutional standards, and I order that the evidence obtained pursuant to the seizure be suppressed.

    SO ORDERED.

                                    /s/ REGINALD C. LINDSAY

                                    United States District Judge

DATED: June 15, 2006